O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| EASTERN MUNICIPAL WATER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>INDUS INTERNATIONAL, INC.,<br><br>Defendants. | Case No. EDCV-08-00015-SGL (OPx)<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS; ORDER AFFORDING PLAINTIFF LEAVE TO FILE SECOND AMENDED COMPLAINT |

Presently before the Court is defendant Indus International, Inc.'s ("Indus") motion for judgment on the pleadings filed against plaintiff Eastern Municipal Water District's ("Eastern Municipal") first amended complaint. For the reasons set forth below, the Court **GRANTS** Indus' motion in part, but affords Eastern Municipal leave to file, with certain modifications, its proposed second amended complaint.

Eastern Municipal entered into a Professional Services Agreement ("PSA") with Georgia-based Indus on May 22, 2006, wherein Indus agreed to install its customer billing software, Indus Suite 4.0, on Eastern Municipal's computer system. Contemporaneously with the execution of the agreement, the parties entered into a Software License and Maintenance Agreement ("SLMA"), in which Indus granted Eastern Municipal a license to operate its Indus Suite 4.0 software as well as provide maintenance service of the software once it was installed on Eastern Municipal's computer operating system.

The PSA contained certain provisions pertinent to the present motion.  First, the agreement contained a choice of law provision specifying Georgia law as governing its provisions. (First Am. Compl., Ex. A ¶ 18.1 ("This Agreement is made in and shall be governed by the laws of the State of Georgia, without regard to its choice of law principles")).  Next, the agreement specified that "no action, regardless of form, arising out of this Agreement may be brought by either party more than one year after the cause of action has accrued." (Id. ¶ 18.6).  The PSA further spelled out that the obligations contained within it were separate and apart from those contained in the SLMA, such that the two should not be read as a single agreement, and, just as importantly, that if there were a conflict between the agreements' terms those in the PSA would govern:

> **16. Separate Agreements.** Client acknowledges that it may license Indus' software [provided for in the SLMA] without utilizing Indus' consulting services [provided for in the PSA] and that it may utilize consulting services of third parties.  Client agrees that this Agreement [i.e., the PSA] . . . is a separate and independent contractual obligation from the License Agreement [i.e., the SLMA].  Client shall not withhold payments that are due and payable under this Agreement[, i.e., the PSA,] because of the status of any software licenses or schedules, nor shall Client withhold payments that are due and payable pursuant to the License Agreement or schedules thereto because of the status of services performed under this Agreement[, i.e., the PSA].  If there is any conflict between the terms of this Agreement[, i.e., the PSA,] and the License Agreement, the terms of this Agreement will control.

It is alleged that, during the negotiations leading up to the execution of the PSA, Indus officials made certain fraudulent and /or negligent representations about the quality of their customer billing software and its compatibility with Eastern Municipal's computer operating system that "induce[d] Plaintiff to enter into the" agreement. (First Am. Compl. ¶ 7).

Specifically, Indus made the following representations:  (1) That it had "extensive experience installing the Indus [Suite 4.0 computer] utility for new customers," as evidenced by the fact that "68 percent of their customers had migrated from an earlier version of Indus Customer Suite to ICS 4.0"; (2) that Indus had done similar

2

implementations in the past as evidenced by the fact that it "had an out-of-the-box solution for an interface with [the] Oracle Financials and Direct Pay [software on Eastern Municipal's operating system] which they had previously set up for other customers;" (3) that Indus had a tool in place, Indus Pro, that would enable completion on the agreed-upon time line; (4) that Indus Suite 4.0 "was certified to operate" on Eastern Municipal's operating system, Solaris 10; and (5) that another Indus tool, BillGen, would "integrate seamlessly" into Indus' Suite 4.0 system because it had "used it to compute complex rates" in other systems and therefore "could easily handle [Eastern Municipal's] [130,000] water accounts."  (First Am. Compl. ¶¶ 7(a)-(e)).

The PSA contemplated that "implementation of [Indus'] application [would] occur in multiple stages over a time period of nine months."  (First Am. Compl. ¶ 13).  Indus encountered rough waters from the outset in integrating and installing its Indus Suite 4.0 software application onto Eastern Municipal's operating system.  These difficulties eventually lead Eastern Municipal to draw the conclusion that much of the representations made to it by Indus were false:

> During the initial stages [of installing the software], [Eastern Municipal] learned that many of [indus'] representations upon which [Eastern Municipal] relied in entering the [PSA] were untrue, including:  [T]hat Defendant did not have the experience necessary to timely implement the application, as the application was brand-new and had never before been implemented; that Defendant had never done a similar implementation and this was the first of its kind; that the Project Management Tool was not in place, as it was still under development; that not only had Indus Suite 4.0 never been certified to operate in Solaris 10, Defendant had never even attempted to operate it in Solaris 10; and that BillGen would not integrate with Plaintiff's existing operating system and database and could not handle even a small fraction of the number of accounts Plaintiff serviced.

(First Am. Compl. ¶ 13).  This conclusion was drawn, in large measure, by certain "disclosures" made by Indus while it was trying to install the Indus Suite 4.0 on Eastern Municipal's operating system; disclosures that, for the most part, occurred before December, 2006 (a date whose importance will become apparent shortly):

> (1) On August 31, 2006, it was revealed by Indus officials that its "installations" up to that point were really just upgrades of the existing system; (2) in October, 2006, an Indus official confirmed that it had not performed a new installation in the last several years and the Eastern Municipal was its "first Indus Suite 4.0 installation"; (3) "in August, November, and December 2006," it was learned that "none of the consultants Indus provided . . . had any experience with Indus Suite 4.0"; (4) in August, 2006, it was learned that a particular program, Backflow, on the Indus Suite 4.0 "had only limited functionality"; (5) on August 17, 2006, Indus representatives stated that their original estimate "was incorrectly based on a flat file format," and that consequently certain Indus Suite 4.0 functions, NextAxiom and Pro "C", could not be used; (6) in November, 2006, Eastern Municipal was advised that interface between the company's operating system, Oracle Financials, and Indus Suite 4.0 could not be done on a "out-of-the-box" basis but would require "a completely custom solution" that would "nearly double the cost of the interface"; (7) on July 11, 2006, Indus officials advised that Indus Suite 4.0 was not certified to operate on Solaris 10 and Oracle 10G, that it had never been installed on those systems, and had not even been installed at Indus corporate headquarters, these representations were later confirmed at another meeting on August 31, 2006; and (8) in November, 2006, Eastern Municipal was advised that "BillGen could only handle a maximum of 10,000 customers per month, not over 130,000 as had been represented."

(First Am. Compl. ¶¶ 10(a)-(e)).

During the same time Indus was attempting to install and integrate its Indus Suite 4.0 software on the operating system, Eastern Municipal made payments to Indus totaling $1,751,044.45.

Eastern Municipal later filed suit against Indus in Riverside County Superior Court on December 5, 2007, alleging various state law claims. The matter was subsequently removed to this Court, and Eastern Municipal later filed an amended complaint setting out in greater detail the substance of its earlier claims, namely: For rescission of the PSA due to the "intentional[] misrepresent[ations]" made prior to its execution, the return of money had and received by Indus (the aforementioned $1.7 million) from Eastern Municipal in connection with the performance (or lack thereof) under that agreement, and tort claims for fraud and negligent misrepresentation made in connection with the execution of the PSA. Notably absent from Eastern Municipal's complaint was any mention of defects or other

4

complaints after the signing of the PSA or with the SLMA; the complaint was devoted entirely to misconduct in connection with the execution of the PSA as evidenced by the fact that only the PSA (not the SLMA) was mentioned in the complaint and was the only agreement attached to the complaint as an exhibit.

A.  STATUTE OF LIMITATIONS FOR TORT CLAIMS

Although the parties' spar over conflict of law questions given the PSA's Georgia choice of law provision, those questions need not be resolved given the otherwise fairly straightforward question presented in Indus' motion:  That the tort claims are time-barred. The PSA provides a one-year limitation period in which to file any "action arising out of the agreement"; Eastern Municipal knew (or should have known) by at the latest November, 2006, of the nature of the fraud and misrepresentation claims it has pressed in its complaint; but the complaint was not filed until December, 2007, one month after the limitations period had expired.  What does Eastern Municipal offer in defense?

First, it attacks the choice of law provision in the agreement, arguing that a related agreement that the parties entered into — the aforementioned SLMA — contains a choice of law provision providing that California law applies to the parties' agreement and which also does not contain a contractually-shortened limitations period.  This line of argument is misplaced for two reasons:

First, the subject matter of the SLMA is not implicated in the facts alleged in the first amended complaint.  The present complaint concerns misrepresentations made by Indus as to the quality and compatibility of its software, not issues over how Indus will or can maintain the software once it was installed or whether it properly licensed the software to Eastern Municipal.  Therefore the point that the parties agreed that California law would apply to a separate agreement they entered into covering different topics is immaterial. The specific contract governing the conduct in question controls, not an agreement whose provisions do not touch upon the subject matter of the complaint.

Secpmd. Eastern Municipal argues that somehow the two agreements should be read as a single contract and therefore the conflicting choice of law provisions render the

two agreements at odds with one another. This argument, however, runs up against the problem that in the PSA, the parties specifically and explicitly provided that the PSA was "a separate and independent contractual obligation from" the SLMA. (First Am. Compl., Ex. A ¶ 16). This provision vitiates any claim that the two agreements (and their terms) should be read together as a single cohesive whole. Moreover, even if the two agreements were read together, the PSA also contains a provision stating that should there be "any conflict between" its "terms . . . and the License Agreement," the PSA's provisions would control. (Id.). The effort to bring ambiguity into the parties' contractual arrangement therefore runs afoul of the plain and explicit terms contained in the PSA covering the very question now pressed by Eastern Municipal. Nowhere has Eastern Municipal suggested how or why the separate and independent contractual obligations, or the conflict resolution provisions contained in the PSA should be ignored.

Relatedly, even if one were to accept all of Eastern Municipal's arguments and disregard the Georgia choice of law provision (because of the perceived conflict), it really does not advance their case. The PSA (or even the PSA/SLMA combination agreement) contains an explicit contractual limitations provision (it must be remembered that the SLMA is silent on this point and thus contains no provision conflicting with the explicit terms found in the PSA putting in place a contractually shortened limitations period covering suits brought thereunder), and, irrespective of which state's laws are applied to it, that contractual provision would be honored, be it under Georgia law or under California law.

The only argument that Eastern Municipal raises in this regard is that somehow California courts would not apply such a contractual limitation provision in cases involving a public agency because to do so would threaten the public fisc: "That fundamental public policy is protection of the public fisc. Here, the monies used to pay Indus for the useless software system it installed are public funds, coming from California rate-payers and taxpayers." (Opp. at 2). Tellingly, however, Eastern Municipal has been unable to cite to a single case holding that there is some across-the-board exception to the enforcement of a

6

negotiated, arms-length contractual limitations provision simply because a public agency is a party to the contract. Instead, all Eastern Municipal cites to are cases where exceptions have been made in the context of a public agency's <u>liability to suit</u>. Negotiated limitations periods are a completely different creature under the law whose presence is as a much a benefit to the public agency as it is a threat to taxpayer's money — all one need do is imagine a scenario where Eastern Municipal failed to pay for a certain service from Indus and then sought to employ the limitation provision to dismiss a suit filed by Indus more than a year later.

Where does that leave the Court? The accrual date for the tort claims in the first amended complaint. On this point, Eastern Municipal submits that all that the eight events listed above that took place after the PSA was executed but before December, 2006, simply showed when it "first began to learn there were problems with the functionality and operability of defendant's software system"; that these events simply demonstrate when "problems first started cropping up"; and that the events themselves were viewed by Eastern Municipal at the time as the ordinary "bumps in the road" that all such transactions encounter, not as notice of the fraud and misrepresentations made to it during the negotiations leading to execution of the agreement. (Opp. at 3-4). As explained in the opposition papers, "when issues arose," Eastern Municipal "did not suddenly become aware of Indus' fraud," but rather it "reasonably assumed that such issues were not out of the ordinary, which assumption was only bolstered by defendant's repeated representations that such problems would be addressed and resolved." (Opp. at 4).

This argument mixes concepts concerning the availability of remedies under traditional breach of contract (namely, affording time to correct problems before declaring a breach) with that reserved for accrual of tort claims (that is, knowing when one has been defrauded) that are at issue in this case. The gravamen of Eastern Municipal's complaint is that it was duped into entering into the PSA by certain specified fraudulent and negligent misrepresentations Indus officials made to it beforehand. The eight specified disclosures contained in the first amended complaint directly brought to light the fraudulent or negligent

nature of those misrepresentations. There is no room for doubt, once those disclosures were made, that Indus had been anything but less than forthright beforehand. It is the fact that the disclosures directly contradict the asserted fraudulent statements at issue that is Eastern Municipal's problem, not that the disclosures somehow prompted Eastern Municipal, for a period of time, to try to salvage the business relationship before filing suit.

Eastern Municipal itself in its complaint lists these eight disclosures as evidence indicating that the representations complained of "were not true." (First Am. Compl. ¶ 10). If these eight disclosures are submitted by Eastern Municipal, and they are, as proof positive that the representations upon which its complaint is based are "not true," then the natural corollary is that the occurrence of those disclosures themselves removed any doubt as to the falsity of Indus' earlier representations. Once Indus advised Eastern Municipal that the representations in question were in fact not correct then at that point Eastern Municipal knew, or at least should have know, as a matter of logic and common sense that the earlier representations were either negligently made or were done as a matter of deceit. That the question of a party's discovery of fraud is a factual matter does not mean that the Court should ignore allegations in the complaint itself that indicate when exactly the plaintiff discovered (or should have discovered) such fraud.

For example, Eastern Municipal claims that Indus officials lied when they said their BillGen program tool would integrate seamlessly into the Indus Suite 4.0 software and "could easily handle" all of Eastern Municipal's 130,000 accounts. The falsity of that asserted misrepresentation was palpably apparent the moment Indus told Eastern Municipal in November, 2006, that "BillGen could only handle a maximum of 10,000 customers per month." That disclosure took place a little more than a year before the complaint in this case was filed. Similarly, Eastern Municipal alleges that Indus' officials represented that its Indus Suite 4.0 presented an out-of-the-box solution for interfacing with Eastern Municipal's Oracle Financials and DirectPay software tools on its operating system. The falsity of that asserted misrepresentation was obvious the moment Indus told Eastern Municipal in November, 2006, that "the company's operating system, Oracle

Financials, and Indus Suite 4.0 could not be done on a 'out-of-the-box' basis but would require a 'completely custom solution'." Again that disclosure took place a little more than a year before the complaint was filed. Similarly, it is alleged that Indus represented that it had extensive experience installing Indus 4.0 for new customers. The falsity of this representation was revealed when Indus later disclosed in August, 2006, that its installations up to that point were really in the nature of upgrades, and its further disclosure in October, 2006, that Eastern Municipal was its "first Indus Suite 4.0 installation." Again these disclosures took place more than a year before the complaint in this case was filed. Finally, it is alleged that Indus represented to Eastern Municipal that Indus Suite 4.0 was certified to operate on Eastern Municipal's operating system, Solaris 10. Yet on July 11, 2006, Indus officials informed Eastern Municipal that Indus Suite 4.0 was not certified to operate on Solaris 10, a disclosure that was repeated to Eastern Municipal officials at the August 31, 2006, meeting. These disclosures as well occurred more than a year before the complaint was filed in this case.

These examples and the corresponding disclosures (and the dates of disclosure that go with them) are true of all the alleged misrepresentations at issue in the first amended complaint.

The Court therefore holds that the allegedly fraudulent and negligent misrepresentations that were made prior to the execution of the PSA all accrued more than a year before the complaint in this case was filed. Given the contractually-shortened limitations period, the Court finds that the fraud and negligent misrepresentation claims contained in the first amended complaint are time-barred.

Given that the fraud and negligent misrepresentation claims vis-a-vis the execution of the PSA are time-barred, so too is Eastern Municipal's dependent claim that the agreement should be rescinded because that fraud and/or misrepresentation induced it into entering in the contract itself.

Accordingly, the Court **GRANTS** Indus' motion for judgment on the pleadings insofar as the first amended complaint is concerned.

The only response tendered by Eastern Municipal is that they wish to rescind the parties' PSA due to Indus' non-performance, i.e., not supplying a functioning computer software system as promised. (Opp. at 5 ("Further, plaintiff's allegations also demonstrate that Indus failed to perform under the PSA --- a total failure of consideration. As such, rescission may also be founded upon non-performance/failure of consideration, and plaintiff will seek leave to amend to explicitly state such a theory")).[1] The problem is that the present complaint only seeks rescission of the PSA, and such rescission is predicated upon Indus' "intentionally misrepresent[ations] to Plaintiff" leading up to the execution of the PSA, as set forth earlier in the complaint. (First Am. Compl. ¶ 15). Any other rescission claim Eastern Municipal may wish to bring with respect to other agreements or with respect to other aspects of the PSA (predicated upon different grounds than those asserted in the present complaint) is a separate matter and not one touched upon the facts or law at issue in the present motion.

This leads to the last point, Eastern Municipal's request for leave to file a second amended complaint. Eastern Municipal represents that, if afforded leave to amend, it would "assert a new theory of recovery based on the same set of facts, namely rescission of both [agreements], for a total lack of consideration" and "would also set forth the factual basis for the equitable estoppel/tolling of the statute of limitations for the fraud and negligent misrepresentations causes of action." (Opp. at 7).

Taking the last point first, from reviewing Eastern Municipal's proposed second amended complaint (attached to an ex parte application filed in relation to the present motion), the Court finds no new or refined factual allegations in the proposed complaint that places the factual allegations contained in the present complaint in a new light sufficient to state an equitable estoppel theory. In point of fact, in the motion seeking leave to file the second amended complaint, it appears that Eastern Municipal has dropped this

---

[1] Eastern Municipal also makes mention that a portion of the money that it seeks to recover was made in payment under the SLMA, not the PSA, and therefore they seek leave to amend the complaint to allow that portion of the money had claim to remain intact. (Opp. at 1).

10

basis for allowing it leave to amend its complaint. Instead it argues that it "seeks to amend to allege a new theory of recovery (rescission based on failure of consideration) and to clarify the factual basis for the rescission for fraud, fraud, and negligent misrepresentation causes of action." (Pl's Ex Parte Application, Ex. 1 at 3).

That said, Eastern Municipal's proposed second amended complaint does contain allegations that Indus officials made further fraudulent misrepresentations to it during the time it was seeking to fix the installation problems, see paragraphs 16 through 32 in the proposed second amended complaint. That is, Indus made additional fraudulent statements after the execution of the PSA. These further fraudulent misrepresentations were made in 2007, the same year the complaint in this case was filed. Accordingly, the Court provisionally finds that the contractually-shortened limitations period would not stand as an impediment to Eastern Municipal bringing its post-agreement fraudulent and negligent misrepresentation claims. That said, certain portions of Eastern Municipal's proposed second amended complaint contain allegations related to the execution of the PSA which, as the Court has previously found, are time-barred.

Accordingly, the Court **STRIKES** Eastern Municipal's First Cause of Action in the proposed second amended complaint for rescission based on fraud in the inducement, and dismisses those portions of the fraud and negligent misrepresentation (the third and fourth) claims in the proposed second amended complaint insofar as those claims are predicated upon representations made to induce the execution of the PSA itself. Specifically, the allegations contained in paragraphs 9 through 10 and paragraphs 12, 14, and 15 in the proposed second amended complaint are stricken. The remainder of the fraud and negligent misrepresentation claims pressed in the proposed second complaint remain unaffected insofar as they concern representations made during the contract's performance.

With those exceptions, the Court **GRANTS** Eastern Municipal leave to file the proposed second amended complaint attached as an exhibit to its Ex Parte Application to Continue Hearing on Defendant's Motion for Judgment on the Pleadings.

Dated: August 29, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE